Morristown Knitting Mills v. Commissioner.
Morristown Knitting Mills v. Commissioner
Docket No. 100799.
United States Tax Court
1942 Tax Ct. Memo LEXIS 5; 1 T.C.M. (CCH) 339; T.C.M. (RIA) 42674; 12/30/1942
*5 Unjust enrichment tax: Cotton processing tax not passed on. - Upon evidence that the taxpayer was a small concern and, to avoid the necessity of setting up reserves for refund of the processing tax if it should be passed on and the AAA should be declared unconstitutional, decided to sell its products "net," that is by excluding the cotton processing tax from the sale price, the taxpayer is held not liable for the unjust enrichment tax. The evidence here consisted of uncontradicted testimony of the taxpayer's officers, and contemporary correspondence with customers and agents. The Court was unable to find that it was not supported in substance by the taxpayer's books (showing, according to taxpayer's version, a loss during the period when it was asserted the tax was not passed on, and a gain in other periods) and hence the presumptive correctness of the Commissioner's determination of a deficiency was overcome. George E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., for the petitioner. George H. Mitchell, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case involves a deficiency in petitioner's unjust enrichment tax of $1,491.77 for petitioner's fiscal *6 year ended June 30, 1936. The question is whether petitioner is taxable under section 501(a) (2), Revenue Act of 1936, on the sums of processing tax paid by it as a part of its purchases of cotton yarn, which were later refunded to it by its vendors after the Supreme Court's invalidation of the Agricultural Adjustment Act, on the ground that it has shifted the burden of the tax to others. Findings of Fact Petitioner is a corporation which has been making infants' hosiery, known as socks or anklets, since 1927 at Morristown, Tennessee. It filed its income and unjust enrichment tax returns for its fiscal year ended June 30, 1936 with the collector for the district of Tennessee. The Act of Congress known as the Agricultural Adjustment Act, 1933, imposed a tax on the first domestic manufacturing process on cotton, that is, on "lint" or baled cotton, of 4.2 cents the pound. During the summer of 1935 there was confusion in the cotton textile industry as to the constitutionality of the tax imposed by the Act and the consequent results of passing it on to the buyer as a part of the sale price of goods. Suits attacking its constitutionality were already pending in the Federal courts and *7 on July 13, 1935 the Court of Appeals for the First Circuit held that tax unconstitutional. Butler v. United States, 78 Fed. (2) 1. In order to protect buyers in the event that the Supreme Court should hold the Act unconstitutional, the textile industry adopted and began to include in its contracts of sale of cotton goods about August 1, 1935 what was known as the "Charlotte Clause," which provided that the seller should credit on the buyer's account any tax, computed by employing the Treasury Department's conversion factors, which was included in the price of, and invoiced on, goods 90 days before invalidation of the Act by the Supreme Court and thereafter refunded to the seller because of the invalidation. This conversion factor on the types of cotton yarn bought by petitioner varied between 4 1/3 and 5 1/4 cents the pound. During 1935 and 1936 petitioner sold all its finished goods through J. C. Bossong & Co., of New York City, which sold on samples or asked petitioner to make goods according to the buyer's specifications. The agent would wire petitioner for acceptance or rejection of specific orders, and sometimes petitioner would reject them because *8 the price was too low in consideration of the market and the cost of manufacture, the latter being affected by prevalent wages and general expense, which was calculable by experience, and also by the cost of raw materials where the fluctuation was greatest and least calculable. Shipments were billed by petitioner to Bossong and Bossong paid to petitioner each week the full amount of the invoices, which were made out by petitioner on Bossong's stationery, and Bossong, in turn, collected from the buyer, the petitioner paying to Bossong each month the accumulated amount of commission earned. When the "Charlotte Clause" was adopted by the textile industry, petitioner, which was a small concern, did not wish to include its provisions in its sale contracts and have to set up reserves for refund of the processing tax included in the cost of the goods. Petitioner's president and general manager, Rayburn, therefore determined in September 1935 to sell his goods "not", that is, by excluding the process tax from the sale price; and so advised petitioner's agent, Bossong. On September 12, 1935 Bossong sent a telegram to petitioner quoting a customer's offer on various kinds of goods, to which *9 petitioner replied by wire accepting in part and making a counteroffer. The telegram concluded as follows: "These are not general prices. Do not quote them. These prices are net regarding processing tax * * *". On October 17, 1935 petitioner, by its office manager, Walker, wrote Bossong in part as follows: In view of the unsettled conditions in regard to Processing Tax, and the New Deal Policies, we want to go on record now, that all prices at which we have sold anklets are NET, regardless of the out-come of the processing tax situation, also that any Federal Legislation increasing labor or material costs will be added to the present price. McLellan Stores Co., a customer of petitioner's, wrote Bossong on January 7, 1936 that "Until necessary adjustment in price can be put into effect, no shipments are to be forwarded to any of our stores covering merchandise that is made wholly or partly of cotton."; to which Bossong replied on the next day as follows: I am in receipt of your letter of the 7th with reference to holding up store shipments of hosiery made wholly or partly of cotton. At the time of submitting to you our Anklets I advised you that we had reduced the price of these *10 numbers and quoted them 'Net', deducting the Processing Tax, and in my letter of September 24, 1935, the last paragraph, I called this conversation to your attention. With this understanding. I have not written the Morristown Knitting Mills nor the Johnson City Mills to hold up your deliveries. Bossong's letter of January 8, 1936, quoted above, represents the general instructions which he had received from petitioner on all of its transactions. Petitioner did not add the processing tax as a separate obligation on its invoices nor collect it separately in any way from the buyers of its goods. The Agricultural Adjustment Act was held unconstitutional by the United States Supreme Court on January 6, 1936 (). Petitioner did not then or thereafter reduce the sale price of its goods on this account, but it received from its sellers reimbursement in accord with the 90-day provision of the Charlotte Clause of amounts representing the process tax passed on to it as a part of the purchase price of yarn in the total amount of $2,251.74. Petitioner duly filed an unjust enrichment tax return of this sum (except a small part *11 overlooked and not in controversy here), but gave no specific information relating to its liability for any tax thereon, except to deny it. The respondent accordingly found the present deficiency of $1,491.77. In petitioner's mills 1 pound of cotton yarn made about 1 dozen pairs of infants' hosiery on the average. Petitioner carried a 30-day supply of yarn on hand throughout 1935, but all the yarn bought in any particular month was not always used in that month, the period of its use in manufacture sometime extending as long as 3 months. At the time of the hearing petitioner did not have its 1935 orders available and only a part of its correspondence for that year. It had its ledger sheets showing hosiery sales and cash journal sheets for 1935 and 1936, and also its original invoices for goods sold in 1935 and 1936 but not for earlier years. Its ledger sheets and cash journal sheets were put in evidence. The following schedule also introduced in evidence shows the total sales, the yarn purchased and other manufacturing costs for each of the three 90-day periods, (1) before the Charlotte Clause went into effect, (2) while it was in force, and (3) after the invalidation of the Agricultural *12 Adjustment Act. The petitioner kept no inventories, the only items under that head on its trial balances, of $6,540.47, remaining constant from that of August 3, 1935 to that of April 4, 1936, which were all the trial balance put in evidence. MANUFACTURING AND SELLING COSTS July 10 to October 7, 1935 (90 Days Prior to Charlotte Clause Period) July
August
September
October
1935
1935
1935
1935
Yarn Purchased
$ 6,497.48
$ 9,425.98
$10,582.80
$11,052.39
Dyes and Chemicals
1,131.64
1,023.00
1,163.37
963.43
Knitting Supplies
1,033.24
1,560.60
928.53
592.31
Finishing and Shipping Supplies
1,029.33
1,274.10
1,308.52
1,019.01
Knitting Labor
6,657.23
6,528.81
6,139.84
6,809.78
Finishing Labor
1,512.75
2,222.51
2,428.22
2,503.79
Freight and Express
127.44
110.06
240.03
269.13
Water, Light and Power
201.58
254.94
313.57
252.96
Fuel and Boiler House Supplies
84.24
183.99
320.06
186.26
Commissions
716.81
1,196.80
1,483.51
1,263.29
Traveling Expense
1,428.84
535.53
859.36
867.98
Watchman and Miscellaneous Labor
140.00
113.23
228.67
266.40
Factory Supplies and Expense
87.33
283.74
292.64
215.46
Miscellaneous Office Expense
139.57
78.58
Hosiery Purchases
650.96
716.47
258.59
$20,787.48
$25,442.83
$27,005.59
$26,520.78
Prorated - 22/31 Month
14,752.32
Prorated - 7/31 Month
5,988.50
*13 Total sales during this period were 85,493 dozen and the total sales prices received amounted to $75,144.52, as against total costs of $73,189.24. MANUFACTURING AND SELLING COSTS October 8, 1935 to January 5, Inc., 1936 (90 Day Charlotte Clause Period) October
November
Dec. to Jan. 5,
1935
1935
1936
Yarn Purchased
$11,052.39
$ 8,251.62
$19,038.16
Dyes and Chemicals
963.43
792.14
937.21
Knitting Supplies
592.31
505.35
1,111.79
Finishing and Shipping Supplies
1,019.01
802.26
1,719.60
Knitting Labor
6,809.78
6,555.42
9,172.33
Finishing Labor
2,503.79
1,682.71
2,938.90
Freight and Express
269.13
77.38
479.16
Water, Light and Power
252.96
278.51
351.65
Fuel and Boiler House Supplies
186.26
111.91
342.85
Commissions
1,263.29
717.82
1,115.54
Traveling Expense
867.98
298.63
677.51
Watchman and Miscellaneous Labor
266.40
176.00
250.75
Factory Supplies and Expense
215.46
131.64
171.02
Miscellaneous Office Expense
12.15
58.50
Hosiery Purchased
258.59
680.68
1,785.65
$26,520.78
$21,074.22
$40,150.62
Prorated - 24/31 Month
20,532.28 Total sales during this period were 73,825 dozen and the total sales prices received amounts *14 to $65,920.69, as against total costs of $81,757.12. MANUFACTURING AND SELLING COSTS January 4, 1936 to April 4, 1936 Inc. (90 Days Following Charlotte Clause Period) Jan. 6 to 31,
February
Mar. 1 to Apr. 4,
1936
1936
1936
Yarn Purchased
$14,453.89
$ 4,471.49
$ 5,668.65
Dyes and Chemicals
896.41
597.14
664.98
Knitting Supplies
1,648.33
706.75
939.99
Finishing and Shipping Supplies
1,896.31
844.20
1,343.72
Knitting Labor
7,687.38
6,095.63
7,201.45
Freight and Express
440.83
257.78
(211.02) Cr.
Water, Light and Power
344.17
252.28
311.72
Fuel and Boiler House Supplies
308.22
306.94
253.76
Commissions
2,048.54
1,675.40
1,173.35
Traveling Expense
1,044.55
413.20
438.99
Watchman and Miscellaneous Labor
268.98
272.87
1,119.85
Factory Supplies and Expense
274.07
193.56
647.03
Miscellaneous Office Expense
75.00
25.00
7.60
Hosiery Purchased
10.00
Finishing Labor
2,945.30
2,575.14
2,801.73
$34,341.98
$18,687.38
$22,361.80 Total sales during this period were 125,467 dozen and the total sales prices received amounted to $101,492.30, as against total cost of $75,391.16. Opinion KERN, Judge: The sole question is whether petitioner *15 is liable for the unjust enrichment tax on process taxes which it admittedly received by way of refund from those who sold it yarn. The amount of the refund is not contested. All secondary questions have been waived. Petitioner makes two contentions: (1) that it did not pass the burden of the tax on to the buyers of its goods and so is not liable under section 501, Revenue Act of 1936, [1] and (2) that the refunds received by petitioner in 1936 were reductions in the purchase price of the yarn and not taxable under the provision above. In the light of our decision, we find it unnecessary to consider the second point. *16 The respondent's determination of a deficiency in the unjust enrichment tax carries with it a presumption of correctness. to rebut this petitioner must show that it did not pass on either separately or as a part of the purchase price of its finished goods the process tax laid on lint cotton by the Agricultural Adjustment, which, as a consequence of the Supreme Court's holding on January 6, 1936 that the Act was unconstitutional, was refunded to petitioner by those who sold it yarn pursuant to the so-called "Charlotte Clause." We think that petitioner has done so. The uncontroverted evidence of petitioner's president and manager R. L. Rayburn, was that petitioner, being a small concern and not finding it feasible to set up reserves for repayment to its customers of the tax, should it be later invalidated, decided in September 1935 not to exact the tax in any way from the buyers of its finished goods. Petitioner's contemporary letters to its selling agent in New York City, set out in our Findings, that its prices were to be "'net' that is, excluding the processing tax," confirm this testimony. Rayburn further testified that he did not order any change or reduction in petitioner's prices *17 for its goods after the Act was held invalid in January 1936. This testimony is uncontradicted and must be given full credence. The taxpayer is not confined to the one method of proof suggested in the statute, ; Jaski, ibid. 321; . Respondent suggests that it was inherently and patently improbable that the petitioner would have taken these steps in anticipation of the invalidation of the Act so early as September 1935, but we think, on the contrary, that petitioner's acts were natural in view of its limited financial structure, the First Circuit's invalidation of the Act on July 13, 1935 in , and the knowledge that that case was then before the Supreme Court on certiorari. The only question, therefore, is whether we are to disregard entirely the uncontradicted testimony of petitioner's officers, with its supporting documentary evidence, because the compiled tables of petitioner's costs and sales for the 3 periods of 3 months each in 1935 and 1936 do not, as *18 respondent alleges, support this testimony. The first period is for the 3 months, July to September, inclusive, 1935, when petitioner was passing on the tax to its buyers; the second for October to December, inclusive, called the "Charlotte Clause Period," when it did not, as it claims, pass on the tax, and the third for January to March, inclusive, 1936, when it was not passing on the tax, because there was none to pass on, and also was not suffering the burden of it, for the same reason, in its purchases of yarn. The 3-month periods do not run exactly with the calendar months, but are the 90-days next preceding and next succeeding the day of invalidation, which was January 6, 1936. The tables put in evidence have been set out in our Findings. We now set out the summaries of these tables with resulting gain ("realization") or loss, as computed by the petitioner's expert witness, SUMMARY
Costs
Sales
Dozen
July 10 to July 31
22 Days
$14,752.32
$15,776.14
16,383
August
31 Days
25,442.83
22,306.16
28,761
September
30 Days
27,005.59
30,975.45
33,904
October 1 to October 7
7 Days
5,988.50
6,086.77
6,445
Total
90 Days
$73,189.24
$75,144.52
85,493
Average Sale Price Per Dozen
$ .879
Average Cost Price Per Dozen
.856
Average Net Realization Per Dozen
.023
*19 SUMMARY
Costs
Sales
Dozen
October 8 to October 31 24 Days
$20,532.28
$20,318.90
21,430
November 30 Days
21,074.22
15,348.61
16,851
Dec. 1, to Jan. 5, 1936 36 Days
40,150.62
30,253.18
35,544
Total 90 Days
$81,757.12
$65,920.69
73,825
Average Sale Price Per Dozen
$ .892
Average Cost Price Per Dozen
1.107
Average Net Loss Per Dozen
(.215) SUMMARY
Costs
Sales
Dozen
January 6 to January 31
36 Days
$34,341.98
$34,685.31
42,953
February
29 Days
18,687.38
35,283.77
43,809
March 1 to April 4
35 Days
22,361.80
31,523.22
38,705
Total
90 Days
$75,391.16
$101,492.30
125,467
Average Sale Price Per Dozen
$ .809
Average Cost Price Per Dozen
.601
Average Net Realization Per Dozen
.208
It will be seen that petitioner claims a gain (per dozen pairs) for Period I of 2.3 cents, a loss for Period II of 21.5 cents, and a gain for Period III of 20.8 cents; which would roughly correspond, if all factors affecting the situation are present and petitioner's contention is sound, to what we should expect for each period. Respondent attacks these conclusions, however, on the ground that inventories of yarn and finished goods *20 are not included, and petitioner admits this but points out that the testimony shows that the petitioner kept no regular inventories and ordinarily carried on hand only a 30-day supply of yarn; and that this was used within the month, or at most within 90 days. Certainly no true inventories figure in the trial balances, put in evidence, for the only thing called "inventory" therein remains a constant from July 1935 to April 1936. In view of the absence of inventories and the fluctuation of yarn purchases, petitioner suggests a method of calculation that would spread the purchases of yarn over the whole 9 months under consideration and thereby reach an average cost price which might be supposed more nearly correct than one based on the 3-month periods taken separately. Unfortunately, the factor of average cost here employed does not accurately reflect the true cost for each period, for to obtain average cost the cost for the third period, when petitioner no longer paid the tax as a part of the price of yarn, must be included along with the cost for the two prior periods when it paid the tax. Since it is the period differences we are trying to arrive at, it is doubtful how much this *21 method helps. Respondent submits an elaborate analysis of the data and computes elements of cost per dozen and total cost per dozen. The only advantage of this table over petitioner's computation first set out above, however, is to show gain or loss for each month, as well as for the quarter-year. It adds nothing to the indeterminable (except by approximation) factor of inventories. Respondent points out that the sale price per dozen was 89.2 cents for the second, or "Charlotte Clause" Period, whereas it was 80.9 cents for the first quarter after January 6, 1942; and that it was 85.114 cents for December 1935 as against 80.751 cents for January 1936, which shows a decline after the basic day of 4.363 cents per dozen pair. From these figures he deduces the fact that the selling price was reduced on or about January 6, 1936 to allow for the tax refund of 4.33 cents per dozen. But we are unable to accept this deduction as an ultimate conclusion of fact in the face of the other evidence. As petitioner suggests, the removal of the processing tax as a burden on the textile industry might well produce a fall in the market price of hose. Again, respondent's point that the falling ratio *22 of yarn and hosiery purchases to sales in the Third Period argues a distortion in the data of purchases may, on the other hand, be explained equally well by the disappearance of the tax as a factor in the cost of yarn. That it was a very important factor can not be doubted. However unsatisfactory the final figures are in the absence of inventories, they appear to support the general conclusion that petitioner was making a gain in the First Period, losing in the Second when it asserts that it was not passing on the tax, and again making a profit in the Third, after the tax was no longer a factor. In short, we are not satisfied that the testimony of the petitioners' officers and the documentary evidence to the tax was not passed on after September 1935 is not supported in substance by the general conclusions to be drawn from the petitioner's books. We are of the opinion, therefore, that petitioner did not pass on the processing tax for the period in question and is, therefore, not liable for the unjust enrichment tax deficiency found. Judgment will be entered for the petitioner. Footnotes
1. REVENUE ACT OF 1936: SEC. 501. TAX ON NET INCOME FROM CERTAIN SOURCES. (a) The following taxes shall be levied, collected, and paid for each taxable year (in addition to any other tax on net income), upon the net income of every person which arises from the sources specified below: * * * * *
(2) A tax equal to 80 per centum of the net income from reimbursement received by such person from his vendors of amounts representing Federal excise-tax burdens included in prices paid by such person to such vendors, to the extent that such net income does not exceed the amount of such Federal excise-tax burden which such person in turn shifted to his vendees. * * * * *
(d) The net income from reimbursement or refunds specified in subsection (a) (2) or (3) shall be computed as follows: From the total payment or accrual (1) of reimbursement to the taxpayer from vendors for amounts representing Federal excise tax burdens included in prices paid by the taxpayer to such vendors or (2) of refunds or credits to the taxpayer of Federal excise taxes erroneously or illegally collected, there shall be deducted the expenses and fees reasonably incurred in obtaining such reimbursement or refunds. (e) For the purposes of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows: (1) From the selling price of the articles there shall be deducted the sum of (A) the cost of such articles plus (B) the average margin with respect to the quantity involved; or (2) If the taxpayer so elects by filing his returns on such basis, from the aggregate selling price of all articles with respect to which such Federal excise tax was imposed and which were sold by him during the taxable year (computed without deduction of reimbursement to purchasers with respect to such Federal excise tax) there shall be deducted the aggregate cost of such articles, and the difference shall be reduced to a margin per unit in terms of the basis on which the Federal excise tax was imposed. The excess of such margin per unit over the average margin (computed for the same unit) shall be multiplied by the number of such units represented by the articles with respect to which the computation is being made; but (3) In no case shall the extent to which the taxpayer shifted to others the burden of the Federal excise tax with respect to the articles be deemed to exceed the amount of such tax with respect to such articles minus (A) the portion of the amount of the Federal excise tax (or of the reimbursement specified in subsection (a) (2) with respect to the articles which is paid or credited by the taxpayer to any purchasers as specified in subsection (f) (3) and minus (B) the amount of any increase in the tax under this section 602 of the Revenue Act of 1932 for which the taxpayer under this section became liable as the result of the nonpayment or refund of the Federal excise tax with respect to the articles. (1) The taxes imposed by subsection (a) shall be imposed on the net income from the sources specified therein, regardless of any loss arising from the other transactions of the taxpayer, and regardless of whether the taxpayer had a taxable net income (under the income-tax provisions of the applicable Revenue Act) for the taxable year as a whole; except that if such application of the tax imposed by subsection (a) is held valid, the tax under subsection (a) shall apply to the portion of the taxpayer's entire net income for the taxable year which is attributable to the net income from the sources specified in such subsection.↩